MOSES R. SANDERS AND MARTHA JANE, HIS WIFE, *vs.* ROBERT ROGERS.

A trustee, who held bonds for money, given in 1858, and well secured by a mortgage of real estate, in trust to invest the proceeds, as soon as practicable, in "lands or negroes," *held* to have become liable to his *cestui que trust*, as for a breach of trust, for receiving payment of the bonds, in March, 1863, in Confederate Treasury notes, then much depreciated, and depositing the proceeds in a bank, to await an opportunity to invest, until March, 1864, when, under the pressure of an Act of the Confederate Congress, he converted them into a certificate of 4 per cent. Confederate stock.

Where the instrument creating the trusts directs in what kind of property the trust funds shall be invested, the trustee will be liable for departing from the direction, unless it is done without fault on his part. Where there is no such direction, and the investment is made in securities of a class not disfavored by the Court, then, if the trustee acts with prudence and honesty, he will not be liable if, from circumstances which he could not control, a loss should ensue.

BEFORE CARROLL, CH., AT DARLINGTON, FEBRUARY, 1867.

Appeal by the plaintiffs from the Circuit decree.

On the 22d July, 1856, George C. James, the father of the female plaintiff, executed a deed whereby he conveyed to T. B. Haynesworth, Esq., a certain tract of land, in trust, for the sole and separate use of the plaintiff, Martha Jane, for life, free from the control and liabilities of her husband, with remainder to him for life, if he should be the survivor, and, after his death, to her children; and with power in the trustee to sell the land, at the request of the plaintiffs—"but the proceeds of the sale shall be invested, as soon as practicable, in other lands or negroes," to be held subject to the uses, trusts, restrictions and limitations thereinbefore expressed. Under the power thus conferred, Haynesworth sold the land, on 8th November, 1857, to James H. Pawley, for $4,142.50, and took Pawley's bonds for the purchase money, payable in one and two years, secured by a mortgage of the land. Haynesworth died in April, 1861, and on the 25th December of the same year, the defendant, Rogers, was appointed trustee under the deed. The bonds of Pawley, then due, and, except as to a part of the interest unpaid, were, shortly afterwards, turned over, together with the mortgage, to the defendant. On the 9th March, 1863, Pawley paid to the defendant $5,030.08, in full of the amount then due on the bonds. Some twelve or thirteen hundred dollars of that sum were paid in Rogers' own promissory notes to one Pollard, of which Pawley was the holder, and the balance was paid in Confederate Treasury notes.

On the 1st April, 1863, the defendant deposited in the Bank of Georgetown, to his credit, as trustee, $5,030.08, the full amount received from Pawley; and, on ——— March, 1864, he converted $4,100 of this sum into a certificate of 4 per cent. stock of the Confederate States.

The object of the bill was to compel the defendant to account, in good money, for the amount due on the bonds when he received payment in Confederate currency. Such other facts as appeared in the pleadings and the evidence, and were deemed material, may be found in the decree of the Circuit Court, which is as follows:

CARROLL, Ch. When the defendant, Rogers, became the trustee, under the deed of George C. James, of 22d July, 1856, he received certain bonds of James H. Pawley, as parcel of the trust estate. These bonds were executed the 8th November, 1857, bore interest from 1st January, 1858, and were payable, respectively, on 1st January, 1859, and 1st January, 1860. They seem to have been sufficiently secured.

On the 24th March, 1863, they were paid in full to the defendant, Rogers, the aggregate of the debt then amounting to $5,030.08. Payment was made in the Treasury notes of the late Confederate States of America, which were received at par, and, being afterwards invested, or the bulk of them, in four per cent. Confederate bonds or stock, became utterly valueless at the termination of the recent war. The contest between the parties is, whether the trustee, Rogers, shall be held responsible, and to what extent, for the value of the bonds against J. H. Pawley. It is objected that the trustee violated his duty, by calling in, unnecessarily, the moneys of the trust estate thus well and safely invested, and by receiving payment in a depreciated currency. The bonds in question were never designed to be permanent investments. Under the power conferred by the deed of G. C. James, the land included had been sold by T. B. Haynesworth, the original trustee, and the bonds of Pawley represented the proceeds of that sale. By the express provisions of the trust deed, upon the sale of the land the proceeds were directed to be invested, "as soon as practicable, in other lands or negroes." The plaintiff, Sanders, had no land, but owned negroes, and there were some twenty negro slaves belonging to his wife's separate estate. It was very natural, under such circumstances, that she should desire a tract of land to be bought, upon which her negroes might be employed, and where she, with her husband, might reside.

Certainly her father, her husband, and her trustee, were under the impression that she wished such purchase to be made. But, upon this point, we are not left to inference merely. Mrs. Sanders, in her testimony, declares that she "at one time tried to buy a tract of land from a Mr. Head." Her father deposes that, "before Pawley's bonds were paid, he heard of a negotiation, between Sanders and Head, for a tract of land. That the former wished to buy from the latter, and that Sanders and wife were then living on the land," which they had rented. The negotiation referred to must have been pending at the payment of Pawley's bonds, and the purchase contemplated by Sanders was none other than that which his wife speaks of in her testimony—a purchase to be effected with the funds of her trust estate. At least, such are the inferences fairly deducible from Sanders' letter to Rogers, of the 15th May, 1863. Nothing had been paid upon Pawley's bonds for more than three years. The doors of the Courts, by the effects of the Stay Acts, as they are termed, were regarded as closed against the collection of debts. The trust of the deed of G. C. James required an investment of the money due by Pawley as soon as practicable. The condition of the trust estate, and the interest and wishes of both Mrs. Sanders and her husband, seem to point to the propriety of an investment of that fund in land, and, at her instance, a treaty was actually on foot with a view to such investment.

Pawley was now ready to make payment of his bonds in Confederate Treasury notes, then the only currency of the country, and, under such circumstances, the trustee accepted payment in that form. At that date, the Confederate Treasury notes had undoubtedly suffered some depreciation. According to the evidence, however, they continued to be accepted in the community, for months afterwards, in payment of debts contracted before the recent war. Large amounts of them were received by the Commissioner in the course of the year 1863; and it was not until the latter part of that year that he "felt in doubt as to whether he should receive Confederate money as Commissioner in Equity." It was further testified that, in 1863, lands had appreciated less than other descriptions of property, and "were sold for Confederate money." Rogers, himself, testifies that "when he received the money from Pawley, he did not suppose there would be any difficulty in buying lands with that money, and Sanders and wife wished land to be bought." It is further contended that the defendant, Rogers, incurred a personal liability for the amount of Pawley's bonds, because he retained the

proceeds in his hands for twelve months, in contravention of the express direction of the trust deed, and then made such investment of them, or the greater bulk of them, as resulted in their total loss. Sanders' letter, of 15th May, 1863, already referred to, is of no little significance, and in more aspects than one. He announces in it the failure of the treaty for the purchase of the land from Head, which he states, however, to have proceeded not from Head's unwillingness to receive Confederate Treasury notes, but from some difficulty in getting good titles. In the immediate sequel of his letter, he makes the request (in which, as he states, Mrs. Sanders joins) that Rogers would put the money out to the best advantage, as they were not disposed to let it be idle. It does not appear that Rogers was wanting in earnest endeavors to invest the fund in land, or, that failing, to render it otherwise productive. G. C. James, the father of Mrs. Sanders, himself testifies that Rogers frequently asked him to aid him in buying land for her; applied to him to purchase the land he resided upon for his daughter, Mrs. Sanders; and, finally, requested him to borrow the trust money, which the witness declined. The efforts of Rogers to invest in land, or let to interest the proceeds of Pawley's bonds, seem to have been abortive; and, at the expiration of twelve months, the money was invested as has been stated, and was entirely, or in part, lost.

The whole amount of Pawley's bonds was not paid immediately and directly in Confederate Treasury notes. Some twelve or thirteen hundred dollars of that sum were paid in certain promissory notes, made by the defendant, Rogers, and payable to Joshua Pollard, of which notes Pawley was the holder. Undoubtedly the notes against himself were not designed by Rogers, when received, to be *investments* of so much of the proceeds of the bonds. Such disposition or use of the money would have been a palpable breach of his trust.—*Spear* vs. *Spear*, 9 Rich. Eq., 184. What he contemplated, upon that occasion, was not the substitution of securities, but the collection of the bonds—their collection in money. No investment in another form of mere obligation or promise to pay was intended. On the contrary, his sole purpose and motive, in the transaction, was to obtain payment *in money*, in order that he might effect another and very different investment—an investment in land. Pawley was willing to receive payment from him in Confederate Treasury notes, and of these Rogers seems to have had on hand a large amount.

To dispense with the mere form of delivering to Pawley the

amount of his promissory notes in Confederate Treasury notes, and then having it immediately returned to him, he received directly his own promissory notes. They were delivered and received as the representative of so much in Confederate Treasury notes, and within a week afterwards the aggregate amount of Pawley's bonds, $5,030.08, was deposited by him in the Bank of Georgetown, to his credit as the trustee of Mrs. Sanders. The dates of the promissory notes against Rogers have not been shown ; but whether they were prior or subsequent to the commencement of the recent war, cannot affect the nature and meaning of the transaction. Any other view of it than that suggested, it is considered, would be a perversion of what was designed and done by the parties. The plaintiffs are not understood as imputing to the trustee any actual fraud or willful violation of his duties. It is said that, "if there was no *malafides* in the conduct of the trustee, the Court will always favor him ; for a trust is an office necessary in the concerns between man and man, and, if faithfully discharged, is attended with no small degree of trouble and anxiety." "This Court," says Chancellor Kent, "has always treated trustees, acting in good faith, with great tenderness."—*Thompson* vs. *Brown*, 4 John. Ch., 628. "The liability of trustees," it is well remarked, "is not measured by the abstract rule of their duty. The universal test of their liability, or exemption from liability, is this: is there, or is there not, evidence of faithful endeavors to fulfill it?" "Any rule more rigorous than this" it is added, "would deter prudent and honest men, of ordinary capacity, from accepting the appointment."— *Hext* vs. *Porcher*, 1 Strob. Eq., 171, 172.

In the defendant's acts and conduct, in reference to the bonds of J. H. Pawley, nothing is perceived which is inconsistent with good faith and honest endeavors on his part, to discharge the duties of his trust. For the loss which has resulted from his investment in Confederate securities, the defendant is, therefore, regarded as not responsible. As, however, the sum so invested ($4,100) is less than the amount received upon Pawley's bonds, a reference to the Commissioner still appears to be necessary. It is ordered that an account be taken of the receipts, disbursements, and all and singular the transactions of the defendant, as trustee as aforesaid, conformably to the principles of this decree.

The plaintiffs appealed, and now moved this Court to reverse or modify the decree, on the grounds :

1. Because the presiding Chancellor erred in decreeing that Rogers had the right to receive the amount on Pawley's bonds in Confederate currency.

2. Because the presiding Chancellor erred in decreeing that the interests of Mrs. Sanders, to whose sole and separate use the property had been conveyed, could legally be affected by the acts or authority of her husband, whose only interest in this property was contingent.

3. Because the presiding Chancellor erred in decreeing that Rogers incurred no responsibility by purchasing his individual notes from Pawley with trust funds.

4. Because the presiding Chancellor erred in decreeing that Rogers' individual notes, purchased by him in his settlement with Pawley with trust funds, did not become, as such, a portion of the trust estate, which he had no right to convert into depreciated Confederate currency.

5th. Because the presiding Chancellor erred in decreeing that Rogers had the right to invest the trust funds in a different manner from that prescribed by the deed creating the trusts, without incurring responsibility.

6. Because the decree does not distinguish between a trustee with discretionary powers and one in whom such powers are not vested, but, on the contrary, justifies one of the latter class for doing an act which the deed of trust prohibits.

*Warley*, for appellants.

*Harlee & Boyd*, contra.

April 20, 1870. The opinion of the Court was delivered by

Moses, C. J. The bonds and mortgage held by the defendant, Rogers, were in his hands, subject to the trusts which primarily attached on the land sold by the trustee, Haynesworth, in whose place, after his death, he was substituted. The deed required "the proceeds of the sale of the land to be invested, as soon as practicable, in other lands or negroes, and the property so purchased to be subject to the same uses, trusts, restrictions and limitations as are hereinbefore expressed of, in, and concerning the premises" thereby conveyed.

Rogers, trustee, was clothed with no discretion as to the trust. The investment of the proceeds of the land was to be made in lands or negroes, and if he had, on the express directions and in-

Sanders vs. Rogers.

structions of the *cestui que trust*, and her husband, diverted the trust fund from the disposition expressed in the deed under which he was appointed, he would be responsible for any loss which may have followed such violation of duty.

In the case of *Womack* vs. *Austin*, decided at the present Term, (ante, p. 421,) it was adjudged, that where the instrument prescribed the mode of investment, unless it could be shown that, without fault on the part of the trustee, it could not be made, he would not be excused for departing from the terms and directions of the deed or will creating the trust. It was not the announcement of any new rule by which the conduct of those holding fiduciary relations was to be measured, but the application of principles almost coeval with the administration of equity.

Where the judgment of a trustee is unrestrained and unfettered, if he resorts to an investment within the class not disfavored by the Court, and acts with prudence and honesty, he will not be made responsible, if, from circumstances which he could not control, loss should ensue. Where it is not controlled by the authority in virtue of which he acts, he will be excused for an erroneous exercise of it, provided there is evidence of honest intentions and faithful endeavors to do his duty.—*Mayer* vs. *Mordecai*, 1869, (ante, 383.)

It might be a contradiction in terms to say that there is faithful endeavor by a trustee to perform a duty, where, the impossibility of doing it not being shown, the duty imposed is violated by the very act of not executing the trust according to the intention of the party who created it, and assumed and promised by the party who accepted it.

The bonds of Pawley were for the purchase money of the land, and they were secured by a mortgage of it. They had been due over three years. The proceeds, when collected were to be invested in other lands or negroes. The mortgage was taken as full security for the debt, at a gold rate. Without a necessity for its collection, the defendant called it in, and virtually allowed Pawley to buy the land at an amount, in depreciated currency, nominally equal to the face of the bonds, when the consideration of the purchase then due and owing was the like sum payable in gold.

It is said, however, that Rogers was obliged to collect, before he could invest in other land. If he had even contracted for a place, to be paid for in Confederate notes, and, on the faith of it, had made the collection, and the sale, by no fault of his, had miscar-

ried, there would have been some reason for his claim of exemption from the consequences of the loss. Without, however, another tract of land in view, or any evidence of a probability that he could soon purchase one with the currency which he accepted, the results of the risk which he encountered must be borne by him.

He had made no contract for the "Head land," for he states, in his answer, "that his attempt to secure it having failed, the complainants having no home, he did, in March, 1863, agree to receive from Pawley the amount of his bonds in Confederate money." If he knew that Pawley was prepared to pay, and was aware of the character of the proposed payment, did not common prudence demand that he should defer the acceptance until he should be satisfied that, with the same notes, he could purchase another piece of land, for the investment in negroes never entered into his contemplation, or that of his *cestui que trust?* The answer and the testimony furnish the fact "that land had not advanced in proportion to other property." The inference is, that it was of ready sale, and· yet, knowing that he could procure the means of payment, he converted the bonds into a depreciated currency, without first contracting for land, to the payment for which he could have applied it. The result was, that Pawley, the debtor, gained a large advantage at the expense of the *cestui que trust,* if the consequent failure of investment in land is to fall upon her.

Generally it is not the duty of trustees to call in money, invested on good real estate, where there is no probable risk.—*Howe* vs. *Earle of Dartmouth,* 7 Ves., 150. If, however, as the decd here required the proceeds of the land to be re-invested in the same way, the trustee would have been acting in proper consistency with the obligation imposed upon him, if, either first securing another parcel of land, he had sought payment of the bonds, or if even well convinced that he could do so in a reasonable time. There is no proof that he made such contract, or that, after the acceptance of the Confederate notes, he essayed, in any active manner, to procure with them another tract of land. On the contrary, he retained the notes on deposit for twelve months, and then converted them into Confederate four per cent. certificates. His excuse for doing this, he avers, is the fact that, under the Act of the Confederate Government, the holders of such notes were required so to convert them by first of April, 1864, or submit to a large depreciation. This necessity was, however, induced by his own act. If the receipt from Pawley, of the said notes, was voluntary, having placed himself in

a position where loss was forced upon him, unless he so converted them, how can it avail to shield him from the consequences of an act which he was not bound to perform, or how can he ask that the burthen should fall on his *cestui que trust?*

The conclusion which we have thus reached does not render it necessary that we should say anything on so much of the grounds of appeal as charge the defendant with liability, because he received from Pawley his own notes in part payment of the bonds.

It is proper, however, that we should briefly state our views in regard to that transaction, lest we might be understood as concurring in those of the appellant.

Where a trustee sells, intending to apply the purchase money to the extinguishment of his own debts, and there is no proof of his means to replenish or acquire an equal sum from other sources, it is a breach of trust.

It was proved that the defendant had on hand abundant means to pay his notes, and that Pawley was willing to receive Confederate notes in satisfaction of them. It amounted, in effect, to exactly the same thing as if he had first paid his debt to Pawley, and then received from him the very bills in satisfaction of the bonds. There would have been a manifest difference had the testimony shown that he was without the ready ability to meet his notes, for then there would have been a dealing with the trust funds for his own private benefit.

It is ordered, that so much of the decree of the Chancellor as adjudges the defendant not responsible for the loss which has resulted from his receipt of the said notes from Pawley, and his investment in Confederate securities, be reversed. That the case be remanded to the Court of Common Pleas for Darlington County, with directions for an account of the said trust estate by the said defendant, on the principles of this opinion, with leave to plaintiff to apply to the said Court for all orders proper and necessary to carry out its results.

*Willard*, A. J., concurred.